On behalf of the FAA, Mr. Michael A. Benedetto, on behalf of the FAA, Mr. Sean M. Mazzari. Thank you, Mr. Benedetto. You may proceed. Good morning. May it please the court. My name is attorney Michael Benedetto. I represent Michael Auriemma in this matter. As your honors are aware, this is an appeal from the decision of the circuit court in DuPage County, denying enforcement of the Coast and Upshore Agreement entered into the violent parties on August 18th of 2004. In denying enforcement of the order, the court did grant leave to appeal pursuant to Supreme Court Rule 340 as a final and appealable order. This court granted a stay of the proceedings below on October of 2013. My argument in this matter and my brief in this matter, as your honors are aware, relies almost exclusively on the very recent decision of Tabassum v. Yonah, which deals very, very extensively with the issues that are involved in this court, which are consideration for a Coast and Upshore Agreement and whether such agreements are conscionable or unconscionable. Very briefly, though the facts are different in Tabassum, the wife agreed not to sue for divorce if the husband would conduct himself properly during the marriage. In exchange, if he did not, the wife was to receive as her own a piece of real estate that the parties had purchased shortly after the marriage. Sure enough, the husband continued his wayward behavior, and after five months, the wife sued to enforce the prenuptial, and as a result, the Tabassum decision was rendered. Tabassum deals with all the issues here, which are consideration and unconscionability. What's a little different, though, is in this case, the dissolution proceeding was voluntarily dismissed by the wife before the P&A was entered into. That's correct. And didn't it state in the P&A that consideration was the dismissal of the… No, it did not, Your Honor. So basically, that was the argument that was made in the trial court. That was the argument that was made in the trial court. That's correct. The trial court accepted that argument. Correct. Why is that wrong? Because that wasn't the facts of the case. The central fact of the case, which the court did not deal with whatsoever, and which Chappelle did not deal with in her brief, was the fact that even though the parties had attempted or were involved in temporary reconciliation, and that there was, even though the divorce case, final word, was not entered into shortly before the postnuptial agreement was entered into, that the fact was that the husband had said that this is now their second divorce case that was ongoing. The present case is their third divorce case. They were involved in a couple of domestic battery cases filed by the husband. And the husband said, this is just not going to do. I am going to sue you for divorce if you do not sign this agreement. The issue of whether the parties had a pending divorce case, whether they were together or not, was considered by the Tavassan court to be a distinction without a difference. What the Tavassan court dealt with, and what we are contending is a central fact in this case, is that, and this is Oriyama's own words, and I quote her, he told me I was to either get a legal divorce or I had to sign this paper. In other words, Mr. Oriyama, even though there was a temporary truce, the parties were summoned back together, he still had it in his mind that this was not going to happen again, or if it did happen again, there was going to be an agreement. There was going to be a piece of paper which was going to say who gets what and how the proceeding is going to be conducted. He wanted that. Was that the basis of this prenup in this case or post-nup? Was there consideration at all here? The consideration was forbearance. Forbearance to sue, to bring the divorce case, or to continue with the present divorce case. That's the central legal issue in this case. That was gone through extensively in the Tavassan decision. In Tavassan, after the parties got back together again, the White filed a lawsuit five months after the agreement was signed. We consider the forbearance here was a period of eight years where the parties stayed together and it was not necessary for a divorce to be filed. The wife was told not by Ms. – it wasn't a threat from Mr. Oriema. She was told by her husband, if you go through with this divorce, there's a chance you're going to lose custody of your children. She was told that by her lawyer. She did not want to lose custody of her children. Mr. Oriema, his consideration again was he said he expended $60,000 on the second divorce case, or that 2003 divorce case, came out of his children's college fund, and he didn't want to repeat that behavior. So he wanted something, and she wanted something. What did she want? She wanted to retain custody of her children. If there were a divorce in the future, is that right? If that divorce would have continued, which the husband threatened to do. She said it very exactly. He told me I was either going to get a divorce or we were going to sign this paper. Tabassum has made it clear that – if I can find the quote here – that forbearance of bringing legal action, even for a limited period of time, is a recognized form of consideration. In addition, Tabassum has also said, any act or promise that benefits one party or is a detriment to the other party is consideration sufficient to support contract. Normal contract analysis. Each party got a benefit. That was the deal she wanted. She wanted to remain married. She wanted to remain mother, custodian, parent, supervisor of her children. And that occurred for eight years. And you will notice here that she left the marital residence shortly after her youngest attained majority age. So it was pretty much what she wanted throughout the proceedings here. So if you want to turn to the other issue of unconscionability? Yes, I shall, Doctor. As a preface to that, you said that the testimony of the wife was that the husband said, either you sign this paper or I'm going through with the divorce. And that was on the heels of him telling her, you're going to lose the kids if I go through with this divorce. So basically, somebody's saying, either sign the paper or lose your kids. Her lawyer told her that. Well, tell me how that's not operating under duress, then. Well, because in every single case that one gets involved in a custody battle, there's a possibility that one could lose custody of their children. Wait a minute. Go back. Didn't the lawyer tell her not to sign it? Right, that's what I was saying. No, you're correct. The trial lawyer, her trial lawyer, Mr. Mohler, advised her. Not to sign it. No, he said to her, you're going to lose custody of your children if you go through with this divorce. Her subsequent lawyer, who represented her toward the end of the divorce case and in the preparation and the execution of the post-nup, Mr. Valenti, I think his name was, he said don't sign it. Now, she was pretty upset at the time she had to sign it. Going back to Justice Burke's point of duress, I mean, why was she not under duress? She was shaking. She was crying. She was told she had to sign it if she wanted to have custody of her children. Why wasn't this procedural unconscionability? Well, first of all, there has to be clear and convincing evidence of unconscionability. She said that parties had looked at this agreement, had gone over it for one or two months. She was represented by an attorney. She said that, yes, she was shaking and crying when she went into the office to sign the paper, but that she had regained her composure. And she also said that her lawyer acted in a professional manner. Well, is it the fact that she had a lawyer that you're relying on to take it out of the procedural unconscionability area? No, I don't think there was unconscionability whatsoever. I think that in some of the other cases I've cited, there's a great deal of emotionality in divorce. People sign agreements crying all the time. We do prove-ups with people crying all the time. The fact that she was emotionally upset, she could have said, I can't do this, I won't do this, I'll roll the dice, let's go to trial, I'll take a chance on losing custody of the children. But she didn't want to do that. That's a choice everybody has in a divorce case. It's a choice everybody has in litigation. What do you want to do? Okay, what is your exposure? That's why people settle. That's why we are encouraged to get people to settle. That's why the law says we should encourage. Agreements are encouraged. They're always encouraged. There was nobody forcing. She never said there was anybody forcing or coercing her into signing the agreement. Some of these other cases, like, for example, Richardson, where the woman had just lost her father, where she went into the lawyer's office not knowing what the heck was going on, where it was a one-sided agreement, a lawyer provided by her husband, okay, egregious facts. Absolutely no egregious facts in this case. The fact that she was upset, okay, the fact that there was this issue is a similar issue. We would not be able to have a single valid barrel settlement agreement if people could constantly come into court and say, I was upset when I signed that agreement. I signed that agreement because I could have, you know, I might not have gotten a million dollars in the settlement. But where do you draw the line? You could draw the line here on the case law. The Tobossum said we're going to use an objective standard here. The objective standards that are set forth in that agreement are very extensive. And the question is whether or not somebody actually, you know, whether there was any undue influence or, as the court put it, deprives a person of a meaningful choice, duress, or legal or morally wrongful acts or threats. And there was none in this case. There was absolutely none. She wanted the deal. Okay, she could have said, well, the lawyer told me not to enter the deal. Let's roll the dice. Let's see what happens here. She didn't want that. She wanted the deal. So she knew enough to disregard the advice of her lawyer. She did. She obviously did. And not only that, but she had eight years to think about it. So what did she give up substantively? She gave up permanent maintenance, correct? Both parties waived maintenance.  Both parties? How was she going to pay him maintenance? And why would she pay him maintenance? I don't know. Given their present economic circumstances, I can't go into that. That's not in the record. At the time of the record, he was making $100,000 to $300,000 a year, and she was making nothing, correct? She was making very little. That is correct. And then how about the property distribution? Well, can I just correct the maintenance, Ron? Sure. Judge Davenport did not use that as a basis for her decision. She didn't even, you know, Judge Davenport wanted very much to rule in favor of Mrs. Oriana, in my opinion. She did not use that as a basis whatsoever. Mrs. Oriana has a career. She's been a certified personal trainer. Do we have to affirm on the exact same basis as the trial? No, no. I understand that what you're saying. This is a dean overview. I understand that. Her income from her being a physical trainer was about $20,000. She put that in an affidavit. But that she was working part-time at the time. Okay. Well, that's what's in the record, I guess. That is correct. What else with regard to any retirement benefits did she get? What percentage? Judge Davenport said that there was an imbalance in the pension distributions. I think Mr. Oriana had something like $56,000, and in IRA she had $3,000. Right. So that was pretty unbalanced. Five percent. Right. It's unbalanced if you only look at that one property element. Look at Mr. Oriana's obligations under the agreement. He had to pay all the mortgage payments. He had to pay for all the cars. He had to pay for the insurance. There were three children involved here. Did she stay home and work? Or did she stay home and take care of the children? And she stayed home, and I understand she worked part-time. But she stayed home and cared for the children? She did. I'm trying to think of—I haven't sat in a divorce court for a while, but I'm trying to think of the last time a divorce judge would look at what a breadwinner did during the course of a marriage and then divide the marital estate based upon the fact that, let's say, a woman is staying home or a man is staying home watching the children, and then the other party is out working, making all the money, and, of course, paying the mortgage, paying the insurance, paying the college expenses, paying everything, because that's just the way they divide up the responsibilities during the marriage. The judge isn't going to look at that and then divide the marital estate in a different way based upon what that person gave up during the marriage. Well, even given that, I mean, she was given a specific amount of equity in the marital residence. Thirteen percent. I think it was— Thirteen percent, I believe the record shows. No, the record— Of the value of the home. I don't believe it shows the value of the home. But the point being that— The equity, I'm sorry, of the equity in the home. Thirteen point seven percent of the interest in the marital residence and no maintenance. No, that was—well, I didn't read it to be the case. Well, that's assuming the hypothetical that they— there was a hypothetical written in the PNA that if the value of the house reaches $750,000, she'd get $103,000, right? Yes, yes. Her equity would continue to rise if the equity in the property would continue to rise. But I didn't realize that—it was my impression that there was— at that time it was my impression that it was 50 percent of what was then the equity of the house. No. Thirteen point seven percent. It was 15 here. Was there anything else that she received besides the percentage in the equity of the home and the small percentage of the retirement account? She was able to keep her—all of her earnings. Those are totally hers. And she was able to keep her personal training business. And the— How is that not substantively unconscionable? Well, I think the way they did it was that Mr. Orellana took on an enormous amount of responsibilities for the family, including 75 percent of the college obligations that the children had. They all went to college. As Justice Berg points out, that's not unusual in a relationship where the woman stayed home and the husband worked. Why is that—why is that—why is he so special for doing that in a case where he trades off of the wife five percent of retirement, 13 percent of the home, and no maintenance? From a marriage that was how many years? At the time it was a 15-year marriage. That's correct. You know, the way I read the case law, the case law does talk about agreements, even if they are unfair, does not make them unconscionable. The standard here is unconscionability, which must be shown by clear and convincing evidence. I still don't see where that 13 percent came in. I was under the impression that it was— Look in the P&A. I have a question about that. I mean, because I'm confused by this real estate provision 6.3. I mean, it says that she's entitled to return of her equity, which is 68.7, and I'm guessing you're saying that that was half the equity in the home at the time, 68.7? Well, that's the way it was put down. It says 68.7 plus one-half share of any percentage appreciation to the equity on the residence. So the way I read it was that—so the standard share would remain one-half of the equity, $68,700, plus a half share of any appreciation there, too. Just based on that equity? Correct. So what I'm saying, though, is—and then the hypo in here is, you know, if they had a house that had a value, an equity of $750,000— Excuse me. You said equity. Do you mean fair market value? Fair market value. Okay. I don't even know. I don't know what—I'm having trouble reading this. Okay, then it says if there's a fair market value of $750,000, then she would get 68.7 times 50%, which is 34— I don't understand that either. A 50% rate of return. The page before this has a 50% rate of return. Oh, so basically—so if the equity went up 68.7 or more— It would continue at 50% of any increase in the equity. That's why I read it as the 68.7 was then 50% of the then equity of the property. I don't read it any other way, and that's typically the way that we would do that. And I don't see where— So if they bought another house that was worth a lot more money, her equity number stayed the same. No, it wouldn't go up. But her 68.7—let's say they took her 68.7 and they took $500,000 of his money at the time and put it into this new house. Her share would only be 50% of the—of what? Of the equity in the new house. Of the entire equity in the new house. Right. Even the amount that he put in. Right. Even the $500,000 he put in. Right. It would be a gift to wife. She's entitled, actually. There's a provision in there that says any gifts from other people— So this doesn't limit that, then? No, it doesn't limit it. So let's say that both the fair market value and the equity in the house was $750,000. She would get 50% of the increase above the original hundred and whatever that would have been, 68.7. Right. Well, I didn't prepare the agreement, but that's the way I read the agreement. Okay. I never thought there was any inequity with respect to the real estate. It was never raised as an inequity. In fact, the bullet penalty claims she's getting nothing. But if you read the agreement, she's getting the $68,700, and she's going to—she gets it paid out upon emancipation of the youngest child, or as it says, sooner if the parties would agree. So for them to say that she's going to lose her equity in the house, it's totally contrary to the agreement itself. I'm not reading it that she's going to lose the 68.7. I'm just reading it that her equity was limited to 68.7. Like, basically, no matter—they could live in the Taj Mahal, but her equity is 68.7, and that's all she's going to get is that 68.7 plus 50% of any increase on that 68.7. I don't know if it would have been a percentage or what. Again, I think it's a very ambiguous writing, but that's just my opinion. Well, I think the reason they put the formula in there was to show that her equity would increase. In other words, if she was going to be limited to a 68.7, it would have said, that's it. That's all you're going to get. No matter what we buy, no matter what the bill of real estate goes up, we're going to limit it to 60. And it doesn't say that. It sets out the formula for the amount that she would receive upon eventual dissolution or upon sale of a residence. I think the only—as I said, the only seemingly monetary imbalance was with respect to the pensions at the time. But if you take a look at that, even if you use that, she's getting one-third of the estate. Minimal, she'd be getting that, plus not having to contribute to any obligations as a result. Talking about divorce cases, it's very unusual for a person to say that the woman would keep all of her earnings during the course of a marriage. Say she put it in a bank account somewhere. That's marital property. She's not entitled to 100 percent of that. Twenty-some thousand dollars? Pardon me? Twenty-some thousand dollars? If she put $20,000 away— Okay, so you're operating under the assumption that she gets paid $20,000 and she doesn't spend it. She can do that under the agreement. Yeah. Are you a father? Do you have children? I certainly do. Have you ever had money in your pocket and didn't spend it? Well, I would say that's true, but my point is that whatever she wanted to do with it, she had a right to do. So how much money was he giving her to take care of the kids throughout the day? He was providing the roof over the family's head. He was providing for all the expenses, medical insurance. She didn't have to take anything out of her pay for medical insurance. But there was quite a disparity in their income, was there not? There was a disparity in income. Wasn't he able to keep, according to this agreement, any money he didn't spend on the house, on the family, wasn't that his non-marital money? Is that part of it or not? I think they both have the same right, if I'm not mistaken. So if he's making, again, I don't know what he was making, but there's some evidence of $300,000, some evidence of $100,000. But let's say he's making $300,000 and he spends two-thirds of it on the family. If he gets to keep her $20,000 a year for eight years, he gets to keep his $100,000 a year for eight years. I don't know. This all just goes into the mix. We'll hear from Mr. Mazzari now, and then Mr. Benedetto, you will have time for your follow-up. Thank you, Your Honor. Good morning. Good morning. May it please the Court, my name is Sean Mazzari, and I appear on behalf of Sandra Pereira, the appellee in this matter. I'd like to open this argument with a question. It's a question that's asked of me when I'm asked to speak at schools or other civic events about what is the law and why do we have law in the United States? Why do we have law in the state of Illinois? And my easy answer for that is the law is nothing more than the mores, the rules by which we as a society choose to live. And the laws are also here to protect us. And we in the legal profession have two major responsibilities with consideration of the law. The first, as this Court does, is to interpret the law. But I think more importantly, anyone involved in the legal profession has a right to uphold the integrity of the law. And that's how I see this case. We are here talking about an agreement that had no consideration, and I have yet to see a more unconscionable agreement. So you don't agree that there was any consideration whatsoever? I think any consideration is past consideration and cannot be considered by this Court. Based upon the fact that the PNA was written after the divorce? Four months after the divorce was dismissed. It was entered four months after the divorce was dismissed, as the trial court properly pointed out. And by signing the agreement, Mrs. Oriana gave up everything. She did not receive one benefit from it. Wasn't there some evidence that the husband would forbear from suing for divorce on his own? Was her testimony that either sign the paper or I'm going to go get a divorce? And that's a threat. Pardon me? And that's a threat. And there's nothing in this case other than a threat. If you look at the common law record in this case, there were three contentious divorces. There were orders of protection. There were domestic violence. And we have a husband saying, sign the paper or I'm going to kick you out of the house. You're not going to see your children. And by the way, you're not going to get any money. So you're saying it's coercion? That's the nature of the agreement. I'm saying there's no consideration. I'm saying there was coercion and duress. And I'm saying it was substantially unconscionable. And I think the trial court correctly saw that when they pointed out in the record on the motion to reconsider, the trial court specifically stated on the maintenance issue alone she found it unconscionable and pointed to the discrepancy in the retirement funds. The agreement itself, there was a lot of discussion as to each getting to keep their own money. It's not their money. They're married. It's marital funds. In most divorce settlement agreements or most rulings, 50% is the bare minimum. When a lady comes into my office or a gentleman comes into my office, they say, what's my worst-case scenario? I say, generally, your worst-case scenario, in this case, based on these facts, I would tell them, this is R.E.M., is 50% of the marital property, not 5%, not 13%, 15%. Talk about the 13%. Your opponent disagrees that the house and the equity in the house was 13.7%. And the agreement, as you've struggled with it, I have struggled with it also. But if you take a look at the example they give, and I believe it's on page 11 of the agreement, section 6.3, there's an example. And the example states, for example, if the parties sell the marital residence and purchase an additional home for $500,000, then at the time of the filing, petition of dissolution of marriage, the fair market value of that home is $750,000. Then they take out any remodeling costs that would equal a 50% rate of return. So all she would be entitled to receive on a $750,000 home is her $34,000 plus her approximately $103,000. Normally, that would be $375,000. She's only receiving $103,000. It's confusing also because does that mean that the only equity in the home is $250,000, which means that she would then receive $103,000 of the $250,000 if they're buying it for $500,000 and selling it for $750,000? Or does it mean that they're owning it outright for $750,000, which I don't know who would have that luxury, but they're owning it outright for $750,000, and then she's only getting $103,000? There's a big difference here based upon how you read this. If she's getting $103,000 of $250,000, it's not as unconscionable as if she's getting $103,000 of $750,000. I understand that, but the agreement's not clear, and I don't think we can guess. And if the agreement's not clear, most of the courts are going to find it unconscionable. And did his attorney draft the agreement? Did his attorney draft this? Yes, his attorney did draft this agreement. The whole premise of this agreement is built on the fact that I get to keep mine and you get to keep yours. Well, I think that's going to fall from whatever angle you come in. The right legal premise is anything earned during the course of the marriage is marital property. Divorce law 101. It's ours to split. It's the marriage's to split. It's not mine to keep. It's not yours to keep. It's something that needs to be split. And a trial court, in looking at a division of property, is charged with making an equitable distribution of marital property. Unless people agree otherwise. Here we have in front of us an agreement otherwise. And that gets back to my initial argument that we need. But the law and the whole principle behind substantive conscionability and procedural conscionability is to protect individuals from themselves. Well, she had legal counsel. She had legal counsel, and the legal counsel said don't sign it. But she made her own decision. She made a decision, but how was that decision made? And that goes into the argument that I raised in my brief. The procedural unconscionability and the points were raised, and you know the facts about what happened when she wanted to sign it. First of all, the appellant opened his argument with a threat. Sign it or you're gone. Okay? So that's how we open the negotiations. With a threat, you're going to lose your case. If you sign it, you can come back home and raise your children. If you don't, I'm divorcing you. There is a good way to start a negotiation. Then she gets there. She takes it to a lawyer, a seasoned lawyer. Mr. Valenti says don't sign it. She goes back and she signs it. That's where you are charged with protecting the integrity of the law and protecting the integrity of how we do this. I mean, a lot of it looks at me. You're right. If you're talking about procedural unconscionability and threats and duress. But, you know, I mean, the other side is going to argue that the husband said, look, sign it or I'm going to divorce you. And her own attorney, not Mr. Valenti, but the prior attorney, told her apparently that you have a distinct possibility of losing custody of your children. So here's a woman. Let's say she's a total sound mind who has to make a decision. My husband is going to divorce me and I may lose my kids or I sign this paper that's completely one-sided. Let's say it's completely one-sided. How is that not the benefit of the bargain? She was able to stay in the home and raise her children until they reached majority. Did she not receive the benefit of her bargain? No. She was doing what she was obligated to do under the law. And I cited the Supreme Court case of Weigert, W-I-E-G-E-R-T, which said under the circumstances exactly like this. And if you look at the trial court record, in my examination of Mr. Arellano at the hearing, I went down the elements of Weigert. And he met each and every element. All she was doing was promising to come home and do what she was obligated to do under the law. No additional monies were given. No additional consideration was given. Wasn't there no fault in Weigert? Wasn't there a finding by the court that no one was at fault for the divorce? Right. It was a partition case. But it was an agreement. The essence of Weigert is there was an agreement for the wife to come home and assume her duties which she was otherwise obligated to do under the law. When no one had grounds for divorce. Exactly. Okay, well, that's totally different than now. You don't need grounds for divorce. And there's evidence in this case that there was marital discord. But the statute says, Justice, that the grounds for the divorce have nothing to do with the property distribution. They really don't. That's a separate mistake element, and it's something that's really, really, it's never looked at in the distribution of the marital property or the marital debt. But we're talking about forbearance from filing a lawsuit for divorce. Okay. Whether or not you are, for consideration, whether I'm going to forbear filing a lawsuit for divorce. And the cases, even probably after no-fault divorce, if there's no marital discord, say, you're right, the Supreme Court has said, you're just really doing what you're supposed to be doing under the marriage contract. Correct. Correct? Yes. But now under no-fault, if there is marital discord, and you say, I won't file for divorce, you're forbearing from doing something that you otherwise would have the right to do. But the cases don't support that. And Tossenbaum does not support that. Because in all the cases cited by the appellant, forbearance not to sue was one element, but there was also some additional property given up. Tossenbaum, she was to receive a house that was otherwise marital property that the parties would have split. Under that agreement, and if you look at the Tossenbaum agreement, there are recitals in that agreement that go boom, boom, boom. That state, that forbearance is part of the consideration. And they spell out exactly what the parties are going to do. Not so in this case. In Tossenbaum, there was additional property given as consideration. Not in this case. It was the Phillips case where the husband was a drunkard and the wife came back. If he continued to drink, she was going to get $10,000. In all the cases where they talk about forbearance being an element of the consideration, there is an additional element of consideration where there's additional property that the husband is giving up. Not so in this case. So, to close... So is it all property though? I mean, the fact that she's being allowed... I shouldn't say allowed, but she's having... Again, he's not going to file the divorce, and so she's going to be able to keep custody of her kids and raise her kids until they reach majority. It's not property. But that's nothing? But I would argue that's not consideration. She's entitled under the law to do that. If you marry an individual, you're entitled. You know, I find that... just that statement unconscionable. I, as the husband, I'm going to let my wife come into the house and do what she otherwise would do. He doesn't have the right to say, you can come in the house and raise the children. That's not his right. She was given that right when she married him and she took the vows. And so, this whole thing that she gets to come back and live in the marriage as some form of consideration just doesn't fly. That's her right under the law. That's her right under society. And that's how decent people live. Decent people don't live under threats that I'm going to divorce you, I'm going to take your property, I'm going to take your kids. But by the way, if you sign the paper, come on back and buy me a nice happy house. That's the facts of this case. And if that's not unconscionable, so be it. Well, we're kind of conflating unconscionability with consideration. But they go together. And I think you kind of pointed that out. And I'm not citing this as precedent, but in the Campbell case that was decided November 28th, I believe, you talked about the consideration, how consideration kind of dovetails into substantial conscionability and how you normally don't, the appellate court normally doesn't look at the consideration issue because it generally goes to the conscionability argument. And I agree with that. And if you look at the cases, these agreements are either going to be fair or not fair. And in every conscionability case, the party basically has agreed to the agreement. So to say the fact that the person agreed to it, I don't think that has much to do with it. That's why we have judges who say, no, this agreement's not going to fly because I find it unconscionable. If they hadn't agreed to sign it, we wouldn't be here. Exactly. Exactly. How can a person in this marriage waive her payments? That itself is unconscionable. Get rid of all the retirement funds. He gets to keep all the marital funds that are earned. He gets to keep, what, 80 percent of the marital funds that are earned during the marriage? There's nothing conscionable about that. Anything further? Thank you for your time. Thank you, counsel. Mr. Benedetto, rebuttal argument. Thank you, Your Honor. With respect to the issue of how much the husband was earning at the time, I believe the record is completely devoid of how much she was earning at the time this agreement was entered into. Can you say between $100,000 and $300,000? I didn't see that fact. If it's in there, then it's in there. I thought she had alleged $300,000 in the divorce, I guess it would be the second divorce petition, when she laid out some of the assets and things like that. I thought she had alleged $300,000 at that point. Okay. I'd have to review the record again, because I did not have any information about the relative salaries at all. Mr. Lozzari raised this issue about orders of protection. I think that's totally unfair. I think the fact of the matter is that we had put evidence in the record to indicate that Mr. Auriemma had filed two domestic battery cases against Mrs. Auriemma, and in one of those cases she pled guilty. Okay, so I don't think there's anything coming here from Mr. Auriemma where the record would indicate that he somehow physically abused her to the point where she signed this particular agreement. I don't think that was in any of the briefs that I saw. Well, I just got it out today, so I just want to note I don't think it was fair to have it brought up. This is an agreement, okay, in the absence of egregious circumstances. I think that it's important that these agreements be upheld. There's never going to be an agreement that one cannot argue later on is not fair or has some element of unconscionability involved. The courts, and particularly in domestic relations cases, are very well aware that people will plead emotionality, they will plead duress, they will plead whatever they can to get out of an agreement. She had the benefit of this agreement for eight years, Mrs. Auriemma. If she at some point in time had, if you will, collected her wits and decided she made a bad deal, she should have gone into court, gone into declaratory judgment action or something to get this thing thrown out. She waited until she left the marital residence and her husband filed a case before she said this agreement is unfair. I think that we do have, if this were a normal contract case between two businesses, one was a big business, one was a little business, okay, they had agreed this and negotiated this with their lawyers. We would not be looking at these elements. We would not initiate agreements. Well, this isn't a big business versus a little business. This is a husband versus a wife. And when you have safeguards, when you have agreements in the trial courts with respect to divorce cases or disillusion cases, don't you have somewhat of a safeguard built in when you have lawyers and the judge overseeing these agreements? Correct. When a disillusion or a divorce, you have a proof up and the court hears the facts of the case? Correct. We didn't have that here, correct? Correct. But you also understand that, and I'm sure this court gets numerous cases of people who are under 214.01, trying to vacate divorce decrees all the time, and I'm sure what they do is they raise the same issues that Mrs. Ariema has raised in this particular case. That's why we have objective standards for evaluating whether these agreements are enforceable and whether they should be upheld by the court. Did the record show, I mean, I know the record shows a little bit about his income, a little bit about her income, a little bit about the marital residence in this as far as equity goes, and about probably the most evidence is on the retirement plans. But in the original divorce petition, there was some evidence or some allegations that there were checking accounts, savings accounts, that they owned commercial, I think he owned commercial real estate, that he was either an owner or part owner of two businesses, that they owned cars, he owned a boat. I mean, is this stuff all part of the record? It was in the 2003 divorce case. Mrs. Ariema filled out a petition for a restraint order, and she listed all of those as what she believed to be at the time the marital property. I think they had a limousine service, if I'm not mistaken, was included in there. And, yeah, as well as some automobiles. But at no time did she ever establish that he owned an outside business somewhere. Her testimony was, I believe so, which she stated in the proceedings below, not during the preparation of this particular agreement. As I argued, she had eight years to come forward with a piece of paper saying he had some business that he never disclosed, saying that he's got some property he never disclosed. But that was eight years that she was living in the home caring for her kids, correct? Correct. Well, yeah, but they did joint tax returns. They had accounts together. They had any number of things together. And she knew she was going to come into court and have to make a showing, you know, that the agreement was unfair and unconscionable. She knew that? Well, she was coming into court. But at the time she was living with him and raising their children, are you submitting that it was in the back of her mind the whole time that she was going to get a divorce? No, no. What I'm saying is that her later testimony in this case, if she were trying to prove that there was nondisclosure in 2004, she had eight years to come up with records to prove that. And she didn't come up with a single shred of evidence to show that there was some kind of nondisclosure involved. She admitted. First, her testimony, she purged herself five times during her direct testimony. And one of those, she said that she was not going to receive any equity in the property. That proved not to be the case. The other time she said she didn't know what the husband had. And I cross-examined her. I said, was there a complete disclosure in the 2003 divorce case? She said yes. And, again, I just proved it. I tried to show her the 2003 divorce record to show she knew all of this stuff. She put it in one of her petitions. Not only that, she told under oath to Judge Davenport she never made more than $10,000 a year during the marriage. And her affidavit, she said she made $20,000 a year. So she said whatever she had to say to try to get this thing thrown out. I think it was totally unfair. This is an agreement. So the divorce case telling a little untruth, is that shocking? A little bit. A little bit. But, you know, not black and white stuff, you know. We have to counsel individuals all the time. You know, prenuptials, marital settlement agreements, postnuptials. And, you know, I think that the lawyers in this case, her lawyer, his lawyer, did whatever they could to prepare an agreement that they thought the parties wanted. And that the parties signed the agreement, and the parties got the benefits of the agreement. And for their reason, I think that that should be upheld. Thank you very much, Your Honor. All right. We thank the attorneys for their arguments today. The case will be taken under advisement in the standard hearing.